OPINION
In this appeal, defendant-appellant, Donna D. Perkins, seeks the reversal of her conviction on two counts of patient abuse under R.C. 2903.34.
On November 23, 1994, appellant, who was a licensed practical nurse ("L.P.N."), was hired by Aurora Manor Special Care Center ("Aurora Manor"). As part of her duties, appellant was required to administer medications to and assist the Aurora Manor residents, who were in varying stages of Alzheimers disease, with their daily activities, such as getting out of their beds, using the restroom, and eating. She was also responsible for overseeing the nurses aides and nursing assistants and assigning them to their tasks in caring for the Aurora Manor residents. Appellant began caring for the patients on November 28, 1994, and continued to do so until she was terminated for "multiple incidents of patient abuse" on June 22, 1995.
Appellant was alleged to have committed acts of abuse against four patients: Effie Cadik, Louis Cerny, Francis (Fay) Urankar, and Frank Zingale. The alleged incidents of abuse were reported by various nurses aides and nursing assistants who, according to appellant, did not like to work with her in part because she was black and they were white.[1] She reported various incidents of insubordination by some of the aides and assistants, such as changing assignments, refusing to assist a resident to the restroom when asked, and failing to pass out snacks to the residents when required; one of the aides was terminated as a result of a negative report appellant made to the Director of Nursing, Margi Serenari. Appellant claimed that all of the reports of abuse were fabricated by the aides and assistants so that she would be terminated.
Appellant was indicted on four counts of patient abuse, one count for each of the four residents named above. She was tried by a jury and found guilty on two counts of patient abuse for her treatment of Effie Cadik and Louis Cerny; the jury returned not guilty verdicts on the counts relating to Fay Urankar and Frank Zingale. She was then sentenced to six months in prison for each count, the sentences to run concurrently.
On appeal from her conviction, appellant has raised two assignments of error for our review:
 "[1.] Whether the evidence presented was legally sufficient to convict appellant of patient abuse.
 "[2.] The verdicts against appellant for patient abuse were against the manifest weight of the evidence."
Appellant challenges her conviction on two counts of patient abuse, R.C. 2903.34, on sufficiency and manifest weight grounds. Although often confused, these concepts are legally distinct and involve different remedies. State v. Thompkins (1997), 78 Ohio St.3d 380,386; State v. Schlee (Dec. 23, 1994), Lake App. No. 93-L-082, unreported, at 10.
A sufficiency challenge involves an inquiry into whether the state has presented evidence on each element of the crime charged which, if believed, would allow the matter to go to the jury.
 "* * * [T]he test [for sufficiency of the evidence] is whether after viewing the probative evidence and the inference[s] drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence. * * *." (Internal quotation marks and citations omitted.) Schlee, at 10-11.
In other words, a reviewing court should not reverse a jury verdict of guilty on sufficiency grounds where there is substantial evidence upon which the jury could find all of the elements of the crime have been proven beyond a reasonable doubt.Id. at 11. If a reviewing court concludes the verdict was not supported by sufficient evidence, it must enter judgment in favor of the defendant. Thompkins, 78 Ohio St.3d at 387.
A manifest weight challenge, however, contests the believability of the evidence presented and concerns whether the jury clearly lost its way and created a manifest miscarriage of justice in finding the defendant guilty on the totality of the evidence presented. Schlee, supra, at 11. The court, in conducting a manifest weight analysis, will review the entire record, weigh the evidence and any reasonable inferences, and consider the credibility of the testimony. Id. Although a reviewing court may find the verdict supported by sufficient evidence, it may nonetheless conclude the verdict is against the manifest weight of the evidence and reverse for a new trial.Thompkins, 78 Ohio St.3d at 387. A reversal on manifest weight grounds must be by a unanimous court. Id. at 389.
In order to determine whether appellant's conviction on two counts of patient abuse was supported by the sufficiency and/or manifest weight of the evidence, it is necessary to establish the elements of patient abuse. R.C. 2903.34(A)(2) provides: "No person who * * * is an agent or employee of a care facility shall * * * [c]ommit abuse against a resident or patient of the facility." The term "abuse," as applied to this case, is defined as "knowingly causing physical harm * * * to a person by physical contact with the person * * *." R.C. 2903.33(B)(2). "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. * * *." R.C. 2901.22(B). And, physical harm occurs when there is "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C.2901.01(A)(3).
In summary, the following elements must be proved beyond a reasonable doubt before a defendant may be convicted of patient abuse: (1) the accused is an agent or employee of a care facility; (2) the victim is a resident or patient of that care facility; and (3) the accused knowingly, without regard to purpose, caused any injury to that resident or patient. The element in contention in this case is the final element: did appellant knowingly cause physical injury to Effie Cadik and Louis Cerny?
It has been held that an act, such as a slap, which evokes a grimace constitutes physical harm under the statute. State v.Hustead (1992), 83 Ohio App.3d 809, 811-812. The Second District Court of Appeals held in Dayton v. Hadley (June 2, 1986), Montgomery App. No. 9509, unreported, 1986 WL 6330, at * 2, that there is "no indication that pain must be evidenced by an outward physical manifestation in order to constitute `physical harm.'" Moreover, the Legislative Service Note to R.C. 2901.01 states that "precedent trauma" is not a necessary predicate to a finding of physical harm. When there is no tangible, physical injury such as a bruise or cut, it becomes the province of the jury to determine whether, under the circumstances, the victim was physically injured, after reviewing all of the evidence surrounding the event.
The evidence regarding appellant's treatment of Effie Cadik was given by two nursing assistants, Janice Patterson and Gail Hovy, who testified that at some time in November of 1994 appellant approached Ms. Cadik from behind as she was attempting to enter the men's restroom near the nurse's station. Appellant grabbed Ms. Cadik's shoulders, placed her knee in the small of Ms. Cadik's back and then pulled Ms. Cadik's shoulders back so far her knees collapsed. Ms. Cadik let out a loud yell in her native tongue, which was "perhaps a cry of pain." Appellant then seated Ms. Cadik in a nearby chair. Testimony was elicited that Ms. Cadik was a "combative" resident.
Appellant presented only her own testimony in defense of this allegation. She claimed that she only worked for three days in November 1994 and these three days she spent with another nurse as part of the orientation process. Moreover, appellant claimed she did not have any contact with Ms. Cadik during that time period. In essence, rather than presenting a defense that her contact with Ms. Cadik was necessary to restrain her, appellant denied the incident ever occurred. Apparently believing the testimony of the aides over appellant, the jury convicted appellant of patient abuse of Ms. Cadik.
The evidence against appellant relating to Louis Cerny was also given by Janice Patterson. She claimed that sometime in the month of March 1995 she was on duty with appellant and another nursing assistant, Stephanie Emanuel. On this particular occasion, appellant and Ms. Emanuel were in Mr. Cerny's room when appellant called Ms. Patterson in to cut his fingernails; Mr. Cerny was notorious for scratching at the staff with his fingernails. Ms. Patterson claimed that appellant climbed on top of Mr. Cerny, who was in his bed, and sat on his chest with her feet dangling over the edge of his bed, in an attempt to restrain him; Ms. Emanuel was holding one of Mr. Cerny's arms. While appellant was sitting on Mr. Cerny, he was grunting and gasping, and then went limp. Ms. Patterson finished trimming his nails and left the room. No medical assistance was sought for Mr. Cerny after this incident. Testimony was given that Mr. Cerny, like Ms. Cadik, was combative.
Appellant presented the testimony of Ms. Emanuel who stated that she had only worked with appellant and Ms. Patterson on one occasion where they trimmed Mr. Cerny's nails. She testified that appellant, on this occasion, did not sit on Mr. Cerny's chest, but rather they each held one of his arms while Ms. Patterson clipped his fingernails. Also, appellant testified that she did not sit on Mr. Cerny at any time in order to restrain him. Again, appellant denied the incident occurred as Ms. Patterson claimed. It appears the jury believed the testimony of Ms. Patterson over that of Ms. Emanuel and appellant and convicted her of patient abuse of Mr. Cerny.[2]
Regarding appellant's sufficiency challenge, there was evidence in the record from which the jury could have concluded appellant knowingly caused Ms. Cadik and Mr. Cerny physical harm. As stated above, the element of knowledge does not require an inquiry into the purpose for the act, but rather involves the question whether appellant was aware her conduct could cause physical harm. It is irrelevant whether appellant, assuming she committed the acts alleged, was merely attempting to restrain combative patients or whether she intended to injure them. Appellant did not claim, however, that she was justified in using force to restrain the patients, rather, she claimed the incidents, as related by Janice Patterson and the other witnesses, did not occur. Moreover, although no evidence was presented of any outward, tangible physical injury, the jury could have reasonably concluded that Ms. Cadik's outcry and Mr. Cerny's gasping and grunting were outward indicia of injury and pain.
Appellant's first assignment of error is overruled.
Appellant's manifest weight challenge involves a different inquiry. We, as the reviewing court, are permitted to weigh the evidence and, insofar as it is possible from the record, consider the credibility of the witnesses to determine whether the jury reached a just result. Thompkins, supra.
Competing evidence was presented to the jury regarding the treatment of Ms. Cadik and Mr. Cerny. The state's witness on these two counts was Janice Patterson who testified she saw the abuse. Appellant presented her own testimony and that of Stephanie Emanuel who both claimed the incidents did not occur; she did not present any defense regarding her reasons for restraining the patients with these methods, presumably because, according to her, they did not occur. Apparently believing Ms. Patterson, the jury concluded appellant abused Ms. Cadik and Mr. Cerny.
Although the outcome of this case is troubling, the Supreme Court instructed us in State v. Brown (1988), 38 Ohio St.3d 305,313, that judgments supported by some competent, credible evidence going to all elements of the case will not be reversed on manifest weight grounds. There was competent, credible evidence from which the jury could conclude Ms. Cadik and Mr. Cerny suffered physical harm from appellant's knowing efforts. Moreover, although we are permitted to consider it, the jury was in a superior position to judge the credibility of the witnesses, which was the determining factor in this case because of the nature of the "defense" presented, than are we. As a result, we conclude appellant's conviction was not against the manifest weight of the evidence.
Appellant's second assignment of error is not well-taken.
We realize our affirmance of appellant's conviction on these facts may seem harsh, especially given the jury's verdict on the counts relating to Ms. Urankar and Mr. Zingale. We believe this is due to the fact that R.C. 2903.34 seems to criminalize all attempts to restrain combative or difficult patients which may result in discomfort to the patients, without regard to the intention of the provider or the necessity for the physical intervention. No specific defenses have yet been recognized to this crime, although we believe, under the appropriate circumstances, a defense of justification may be available. See R.C. 2901.05 and annotations. At this time, there has not been a challenge to the validity of R.C. 2903.34. Consequently, we see no alternative but to affirm appellant's conviction.
The judgment of conviction and sentence are affirmed.
ROBERT A. NADER, JUDGE.
FORD, P.J., concurs in judgment only.
O'NEILL, J., concurs.
[1] Apparently, some of the aides and assistants contacted the Ohio Department of Health to complain about incidents of abuse at Aurora Manor.
[2] The jury entered a verdict of not guilty on the counts relating to the two other patients: Fay Urankar and Frank Zingale, both combative patients. There were several allegations of abuse relating to Fay Urankar that were presented by five witnesses: Anita Robinson, a nursing assistant, Lynn Kerrett, a nurses aide, Joe Profio, a L.P.N., Jeane Taylor, a nurses aide, and Gwen Wilkinson, a nursing assistant. The first incident was reported by Anita Robinson and it occurred in April 1995. She testified that she heard yelling from the activities room, the room where some of the patients were fed. When she entered the room, she saw appellant grabbing Ms. Urankar by the hair and "slamming" her into a chair. Appellant then yelled at Ms. Urankar that she would eat the food if she (appellant) had to "cram it down her f-ing throat." Ms. Urankar was apparently screaming while appellant did this. Ms. Robinson reported the incident to Joe Profio, but in doing so, told him she had not seen the incident, but Jeane Taylor did. Mr. Profio investigated the situation, but found nothing. Rose Notovny, a registered nurse at Aurora Manor who testified in appellant's behalf, checked Ms. Urankar from hairline to foot at appellant's request and found no evidence of injury. Appellant claimed that she merely stood behind Ms. Urankar and placed pressure on her shoulders to start her into the sitting position. She only did this two times and never yelled at Ms. Urankar.
Another incident was reported by Lynn Kerrett who testified that in April or May of 1995, she heard a commotion from Ms. Urankar's room; the door to the room was closed, but she heard yelling and smacking. When Ms. Kerrett went in to check on Ms. Urankar about one hour later, she saw what she called "fresh bruises" on her arms and "scratches" on the back of her neck. Mr. Profio investigated and saw the same marks. Appellant testified that Ms. Urankar was fighting and striking her while she was trying to get Ms. Urankar ready for bed; she denied striking Ms. Urankar.
An incident in early May 1995 was reported by Gwen Wilkinson who testified she saw appellant slap Ms. Urankar across the face. Appellant denied this allegation.
The final incident relating to Ms. Urankar was reported by Jeane Taylor. In May or June 1995, she heard a "scream" down the hall and went to investigate. Ms. Urankar was attempting to enter a locked unit, but appellant was thwarting that attempt. Ms. Urankar was on the floor kicking at appellant who, according to Ms. Taylor, had her foot on some portion of Ms. Urankar's body. Mr. Profio testified that he was present for the same incident but that Ms. Urankar sat down on the floor between the doors to the locked unit and was kicking at appellant. Appellant did not kick at Ms. Urankar, though. Appellant's testimony was substantially the same as Mr. Profio's. The jury failed to convict appellant for abusing Mrs. Urankar on any of these occassions.
The charges relating to Frank Zingale were remarkably similar to those pertaining to Mr. Cerny. Carolyn Starcher, a nursing assistant, testified that in March 1995 she saw appellant attempting to medicate Mr. Zingale. He refused her attempts, so appellant placed her knee on his chest, held down his hands, held his nose and forced the liquid medicine down his throat. Mr. Zingale choked and vomited. He then was shaking his head and moaning "pretty loud." Appellant then, according to Ms. Starcher, asked Stephanie Emanuel to clean up the mess. Ms. Emanuel testified that she was never asked to clean up Mr. Zingale's vomit. Appellant denied forcing Mr. Zingale to take his medicine; she stated she merely could have placed an "R" in his chart indicating he refused his medicine. The jury found appellant not guilty of abusing Mr. Zingale.